IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

RONNIE JONES,
    Plaintiff,

vs.                                    Case No.: 5:11cv47/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
    Defendant.
_____/

**REPORT AND RECOMMENDATION**

        This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

        Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed.

I.        PROCEDURAL HISTORY

        On January 30, 2006, Plaintiff filed applications for DIB and SSI, and in both applications he alleged disability beginning December 31, 2004 (Tr. 13).[1] His applications were denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on May 20, 2011 (Doc. 14). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

judge ("ALJ").  A hearing was held on May 22, 2009, and on July 15, 2009, the ALJ issued a partially favorable decision in which he found Plaintiff "not disabled" through December 31, 2007, but disabled as of January 1, 2008 (Tr. 13–23).  On December 21, 2010, the Appeals Council denied Plaintiff's request for review (Tr. 1).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.     FINDINGS OF THE ALJ

On July 15, 2009, the ALJ made several findings relative to the issues raised in this appeal (Tr. 13–23):

1)   Plaintiff meets the insured status requirements of the Act, for DIB purposes, through March 31, 2006.[2]

2)   Plaintiff has not engaged in substantial gainful activity since December 31, 2004, the date he alleges he became disabled ("onset date" or "alleged onset date").

3)   Since the alleged onset date, Plaintiff has following severe impairment:  lower back pain, status post laminectomy in January 2006, but this impairment does not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4)   Prior to January 1, 2008, Plaintiff had the residual functional capacity ("RFC") to perform less than the full range of light work, as follows:  he could lift and carry up to twenty pounds occasionally and ten pounds frequently; stand, sit, and walk six hours in an eight-hour workday, as long as he could alternate positions at will; and occasionally stoop, crouch, and climb ladders, ropes or scaffolds.  Additionally, he required the use of a cane in his right hand.

5)   Since the onset date, Plaintiff has not been able to perform his past relevant work as a cook or kitchen helper.

6)   Prior to January 1, 2008, transferability of job skills is not material to the determination of disability because use of the Medical-Vocational Rules as a framework support a finding that Plaintiff is "not disabled," whether or not he has transferable job skills.  Beginning on January 1, 2008, Plaintiff has not been able to transfer any job skills to other occupations.

7)   Prior to January 1, 2008, given Plaintiff's age (forty-two on the onset date), education (high school or equivalent), work experience, and RFC, a significant number of jobs existed in the national economy that Plaintiff could have performed;

---

[2] Thus, the time frame relevant to Plaintiff's claim for DIB is December 31, 2004 (alleged onset) through March 31, 2006 (date last insured).  The time frame relevant to his claim for SSI is December 31, 2004 (alleged onset) through December 31, 2007, since the ALJ found Plaintiff disabled as of January 1, 2008.

therefore, he was not disabled. Beginning on January 1, 2008, however, given the same factors, a significant number of jobs do not exist that Plaintiff can perform; therefore, he is disabled as of that date for SSI purposes.[3]

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[3] Correspondingly, the ALJ found that Plaintiff was not under a disability for DIB purposes at any time through March 31, 2006, the date he was last insured.

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[4] the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must

---

[4] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Report should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

Case No. 5:11cv47/RS/EMT

then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL AND MEDICAL HISTORY AND OTHER RELEVANT INFORMATION WITHIN HIS FILE[5]

    A.    Personal History

Plaintiff slipped off a tank and injured his back in 1987 while serving in the Army, and he received a medical discharge in November 1988 for this service-connected injury (Tr. 719, 728). Plaintiff reported "several relatively painful free years" following the injury (Tr. 723).  Also following the injury he worked as a cook in various types of restaurants, including fast food restaurants and restaurants with buffets or those that offered short-order cooking (Tr. 190).  He last worked in mid-2002, as a cook, and he quit because back problems interfered with his ability to stand for long periods (*see* Tr. 718–19).

    B.    Relevant Medical History

A lumbar spine magnetic resonance imaging scan ("MRI") obtained in 1995 revealed a diffuse annular disc bulge L4-L5 (Tr. 435), and Plaintiff was diagnosed with chronic lower back pain.  In June 2005, Plaintiff saw a physician and reported his last MRI was obtained "at least six years" earlier (Tr. 723).  He also reported that "about one month ago," he began experiencing lower back pain that radiated into his legs (*id.*).  A physical examination revealed pain with palpation and slight swelling left of the lumbar spine (*id.*).  The examining physician noted that Plaintiff walked "with obvious pain" and used a cane, and he referred Plaintiff to the appropriate branch of the Veterans Administration ("VA"), with a recommendation that Plaintiff's total service-connected VA disability rating be increased from its current level (i.e., 30%, with 20% attributable to "inflammation of sciatic nerve" and 10% attributable to a urinary condition) (*see* Tr. 380, 718, 722). In July 2005, Plaintiff reported increased back pain, with parathesias and weakness in the left leg (Tr. 717).  He stated he had these symptoms "on and off" for more than fifteen years, but the symptoms had been "tolerable the last few years" with epidural steroid injections (*id.*).

---

[5] Unless otherwise noted, the information in this section is derived from the opinion of ALJ (Tr. 13–23).

Case No. 5:11cv47/RS/EMT

A lumbar MRI obtained on July 18, 2005, documented epidural lipomatosis as a source of spinal stenosis at L5-S1, and paraspinous muscle atrophy at L5-S1.  It also revealed epidural fat with stenosis at the L4, L5 and S1 levels bilaterally.  In August 2005, a physician noted that Plaintiff was "last regularly seen 3 years ago but [a] recent walk in produced a plethora of referrals and test[s]" (Tr. 708).  By September 2005, Plaintiff complained of "considerable difficulty" with his low back condition (Tr. 706).  In October 2005, Plaintiff reported that although he had back pain for several years, his symptoms had worsened in the last six months (Tr. 322).  He stated his pain now radiated into the left hip, leg, and great toe, and it increased with standing more than fifteen minutes or lifting (*id.*).  He also noted that walking more than a fourth of a mile caused weakness in his legs (*id.*).  Finally, Plaintiff stated he could relieve his symptoms by lying down (*id.*).  Shortly thereafter, he was scheduled for surgery (*see* Tr. 704).

A L4–S1 laminectomy was performed on January 26, 2006.  In early February 2006, Plaintiff reported that he was "doing fantastic" and that his legs felt much better (Tr. 692).  Despite his progress, however, Plaintiff's work restriction was continued for an additional two to four weeks (*id.*).  In early March 2006, Plaintiff reported that although he previously "felt great" following the laminectomy, he now felt pain, tightness in his low back, and heaviness in his legs (Tr. 689).  He described his pain as a throbbing, constant ache, and he rated the intensity of his pain as a six on a ten-point scale ("6/10").  During a physical therapy consultation on March 29, 2006, Plaintiff stated his legs had been giving out, his legs felt heavy and were difficult to lift, and if he lifted his legs it caused back pain.  He rated his pain as 8/10.

On April 6, 2006, Plaintiff reported that thermaphore automatic heat packs, transcutaneous electrical nerve stimulation, and his home exercise program were working well.  He stated his pain had decreased from 8/10 to 6/10.  However, on April 24, 2006, when Plaintiff presented to Mark Clayman, M.D. for a physical evaluation, Plaintiff reported experiencing constant back pain (*see* Tr. 495).  Dr. Clayman noted that Plaintiff's pain management included myofascial release, physical therapy, transcutaneous electrical nerve stimulation ("TENS"), and medications including Lortab and Flexeril (*id.*).  Plaintiff reported a modest response from the treatments and medications, with no side effects.  Plaintiff also stated he experienced outbreaks of pain once a day, that lasted five to ten minutes, during which his pain increased to 10/10, and he could not perform any activities.  Dr.

Clayman noted that Plaintiff could walk approximately one-half of a block, and he observed that Plaintiff walked with a significantly antalgic gait, favored his left side, and used a cane.[6] Dr. Clayman reported that Plaintiff could eat, groom, bathe, use the bathroom, and dress himself but occasionally needed his daughter's assistance. With regard to Plaintiff's physical examination, Dr. Clayman noted no gross pathologic findings on inspection of the spine, limbs, posture and gait, other than Plaintiff's ambulating with the assistance of a cane. The spine was symmetric and revealed no abnormal curvature; no postural abnormalities; no fixed deformity, such as ankylosis or abnormalities of the musculature of the back; no muscle spasm; and no abnormal contour, such as scoliosis, reverse lordosis, or abnormal kyphosis. Finally, a motor examination revealed 5/5 strength and no muscle atrophy, and circumferential measurements were symmetric bilaterally with intact tone and strength.

On May 30, 2006, Plaintiff reported that he was "inhibited by pain," he had burning sensations in the lateral aspects of his thighs, and his pain radiated down his left leg to his foot (Tr. 672). Due to Plaintiff's reports of recurrent radiculopathy following the laminectomy, a lumbar MRI was scheduled. The MRI, obtained on July 24, 2006, resulted in the following impression: status post L4 and L5 laminectomies with improvement of the thecal sac narrowing due to epidural lipomatosis, and bilateral facet hypertrophy and mild disc bulges at L4-L5. Additionally, anteroposterior and lateral views of the lumbar spine, obtained August 8, 2006, demonstrated no evidence of an acute fracture or spondylolisthesis, the lumbar vertebral bodies were normal in stature and properly aligned, the intervertebral disc spaces were normal, and the sacroiliac joints were symmetrical (Tr. 539). However, a laminectomy defect involving L4 and L5 was observed.

Plaintiff continued to receive treatment following the 2006 MRIs. In addition to reporting continued lower back pain, he also reported numbness, loss of strength, and pain in his hands, as well as pain in his fingers, increasing weakness in the hands and arms, and a shooting, "pins-and-needles" sensation in his feet and hands when he extended his neck. Additionally, he

---

[6] Another treatment record from about the same time reflects an opinion that Plaintiff's cane is "medically necessary for ambulation due to his problems with stability" (Tr. 456).

Case No. 5:11cv47/RS/EMT

complained of radiating pain from his back to his feet, pain in his legs, and numbness from his feet to his hips, and he stated that "nothing relieves the pain" (Tr. 657).[7]

In a letter dated December 1, 2006, the VA's Department of Veterans' Affairs informed Plaintiff of its determination that Plaintiff was "now rated totally disabled" and that his condition was permanent (Tr. 228).[8]

An MRI of the cervical spine, obtained in or about early November 2007 (*see* Tr. 578–80, 654), revealed congenital canal stenosis with the most significant levels of stenosis at C3-C4, C4-C5 and C5-C6, as well as moderate disc bulges at C3-C4 and mild cord signal change at C4-C5. An MRI of the lumbar spine, obtained at or about the same time, indicated previous L4, L5, and S1 laminectomies with no significant canal stenosis, or "nerbiated" discs (this presumably is a typographical error, which likely should read no "herniated" discs) that would cause Plaintiff's symptoms (*see* Tr. 655). On November 20, 2007, Plaintiff reported increasing weakness in his hands and arms and worsening pain in his arms and feet with extension of the neck, and he stated that the only thing that relieved his pain was lying down flat on his back (Tr. 654; *see also* Tr. 50–51 (Plaintiff testified that he could not type, hold a gallon of milk, or pick up items such as pennies because he had no feelings in his fingers and could not control them)). Plaintiff was diagnosed with cervical stenosis with myelopathy. His physician recommended a laminectomy and advised Plaintiff to undergo surgery as soon as possible to prevent further neurologic decline (Tr. 655).

---

[7] While the record is unclear on this point, there appears to be a gap in treatment between mid or late 2006 and October 2007 (*see, e.g.*, Tr. 663–65 (reflecting, what appears to be consecutive treatment records or entries in the treatment records, dated August 24, 2006 (treatment record), December 6, 2006 (entry documenting Plaintiff's discharge from physical therapy), and October 4, 2007 (treatment record))). Although Plaintiff reported that he lived in Virginia during this interval and received treatment from a "local provider" in Virginia, there are no medical records in the file from Virginia (*see, e.g.*, Tr. 663). Moreover, evidence in the file suggests Plaintiff was actually incarcerated in Georgia during this interval (*see, e.g.*, Tr. 235 (note dated February 26, 2007, reflecting a report by the office of Plaintiff's attorney that Plaintiff was incarcerated in Garden City, Georgia, and would be there "at least 6 months")).

[8] Plaintiff testified that "a couple of months" prior to December 1, 2006, the VA assessed a <u>temporary</u> 100% disability, which was later increased to permanent (Tr. 39–40). There are, however, no records in the file documenting the temporary total disability. Likewise, the file does not reflect the percentage of the total disability rating attributable to Plaintiff's back condition, although a treatment record dated October 4, 2007, reflects that Plaintiff's service-connected disability rating was "70% for inflammation of sciatic nerve, removal of testes, bipolar disorder and SC/LS strain" but does not explain the nature of the remaining 30% disability (*see* Tr. 663; *see also* Tr. 728 (reflecting in 2008 that Plaintiff's "combined service connection evaluation shown in [Department of Veterans' Affairs] records is: 70")).

In January 2008, Plaintiff underwent a laminectomy at C3-C5, with lateral mass screws. The surgery, however, was unsuccessful in alleviating Plaintiff's symptoms. For example, after the surgery Plaintiff could not use his hands and had no feeling in his fingers. Moreover, he reported more problems with his right hand than his left, which was especially problematic for Plaintiff because he is right-handed and needs a cane for ambulation.[9]

        C.        Other Information Within Plaintiff's Claim File

State agency medical consultants who reviewed the record in July 2006 and March 2007 found Plaintiff capable of a range of light work activity (*see* Tr. 19, 457–64, 549–56).

Additionally, a vocational expert ("VE") testified at Plaintiff's hearing. The VE noted that Plaintiff's past relevant work required more than six hours of standing in an eight-hour workday, which requirements are greater than those included in Plaintiff's RFC. Thus, Plaintiff could not perform any past relevant work. Next, because the ALJ determined that Plaintiff could not perform a full range of light work due to additional limitations, the ALJ asked the VE to determine the extent of erosion of the unskilled sedentary occupational base caused by these limitations, prior to January 1, 2008. More specifically, the ALJ asked the VE whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC (as determined for the time period prior to January 1, 2008). The VE testified that given all of these factors, the individual could have performed the requirements of representative occupations such as ticket seller, surveillance system monitor, and hand packager, which jobs are "mainly seating jobs with some standing" according to the VE. Thus, Plaintiff's need to use a cane would not prevent him from performing these jobs (*see* Tr. 75–78). The VE additionally opined that the need to use a cane in the right hand, by a right-handed individual, coupled with the need to alternate positions every two hours, would reduce the number of available jobs by 50% (*see* Tr. 77–78). Finally, the ALJ asked the VE to consider two additional restrictions, namely, decreased grip strength in the right hand and decreased use of the fingers, especially in the right hand (Tr. 78). The VE opined that these restrictions, which prevent manipulation with the right hand, "would essentially eliminate" the available jobs (*id.*).

---

[9] The ALJ thus found Plaintiff disabled as of January 1, 2008, as previously noted. In making this finding, the ALJ stated, "In determining [Plaintiff's RFC] the undersigned [ALJ] finds it is reasonable to conclude that Plaintiff experienced deterioration in his condition in the months and years after March 31, 2006, his date last insured. [Plaintiff's] development of cervical stenosis with myelopathy and subsequent unsuccessful C3-5 laminectomy directs that a later onset date of January 1, 2008 is appropriate." (Tr. 20).

V.   DISCUSSION

In this appeal Plaintiff contends the ALJ posed an incomplete hypothetical question to the VE and erred in relying on the VE's answer to that question, instead of a question that included all of Plaintiff's limitations. He also contends the ALJ erred in discounting his subjective complaints.[10]

Plaintiff does not directly challenge the ALJ's RFC determination (although he does question, as does the undersigned, the ALJ's finding that Plaintiff needs a cane to ambulate but can climb ladders, ropes, and scaffolds). Rather, Plaintiff argues that the hypothetical question posed by the ALJ to the VE did not include all of his limitations. Thus, Plaintiff indirectly challenges the RFC finding because the hypothetical question is based upon it. As previously noted, the ALJ established Plaintiff's RFC as follows: lift and carry up to twenty pounds occasionally and ten pounds frequently; stand, sit, and walk six hours in an eight-hour day with an ability to alternate positions at will; occasionally stoop, crouch, and climb ladders, ropes or scaffolds; and use a cane in the right hand. Plaintiff's argument therefore centers on the ALJ's failure to include decreased grip strength and use of the fingers in the right hand, because if such deficits existed they would have eliminated available jobs according to the VE.

In response, the Commissioner states in relevant part that "Plaintiff did not develop problems with using his hands until late 2007 and early 2008, at which point he became disabled" (Doc. 22 at 7–8). Thus, the Commissioner's own statement suggests that Plaintiff was disabled by late 2007, which is obviously prior to January 1, 2008, the date the ALJ found Plaintiff disabled. Similarly, in finding Plaintiff disabled as of January 1, 2008, the ALJ fully credited Plaintiff's complaints of decreased use of his fingers and decreased fine manipulation with his fingers, especially in the right hand (Tr. 20). However, the specific complaints the ALJ referenced, and fully credited, were made by Plaintiff in November 2007 (*see* Tr. 20 (referencing Tr. 654–65, treatment records dated November 21, 2007)). Moreover, the complaints Plaintiff made in November 2007 are nearly identical to complaints he made on October 23, 2007 (*compare* Tr. 654–65 *with* Tr. 579). Thus, based on the ALJ's own findings, it appears Plaintiff should have been deemed disabled by no later than October 2007.

---

[10] Because Plaintiff's claims are related, they are addressed together in this Report.

Case No. 5:11cv47/RS/EMT

Additionally, other evidence in the file suggests that Plaintiff's problems with his hands may have begun prior to October 2007. For example, a treatment record dated August 6, 2006, reflects Plaintiff's report that he occasionally dropped things from both hands (Tr. 605). The same record reflects that Plaintiff exhibited some non-dermatonal "patchy numbness" upon sensory examination of the lower upper extremities (*id.*). Furthermore, Plaintiff testified that he began experiencing problems with his hands following his first surgery, which was performed in January 2006, and continuing through his second surgery, which was performed in January 2008 (*see* Tr. 48–52). As previously noted, such problems included an inability to type, hold a gallon of milk, or pick up items such as pennies because he had no feelings in his fingers and could not control them (Tr. 51–52). Plaintiff also complained of a loss of strength in his arms and hands, which resulted in an inability to "grab [things]" (Tr. 48–49). The ALJ failed to mention these complaints. Although the ALJ stated he was giving Plaintiff "the benefit of the doubt" and partially crediting Plaintiff's complaints of <u>back</u> pain, concerning the time frame prior to January 1, 2008, he did not discuss Plaintiff's complaints or testimony regarding his <u>hands</u> relating to the same time frame (*see* Tr. 19). The ALJ erred in failing to do so, in light of the VE's testimony that such problems with Plaintiff's hands would eliminate all jobs.

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, <u>Davis v. Shalala</u>, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); <u>Foote</u>, 67 F.3d at 1562 (stating that an insufficient credibility finding is "a ground for remand when credibility is critical to the outcome of the case"); <u>Salter v. Astrue</u>, Case No. 3:08cv189/RV/EMT (N.D. Fla. May 22, 2009 (Doc. 15)) (same). A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. <u>Davis</u>, 985 F.2d at 534; *see also* <u>Bowen v. Heckler</u>, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); <u>Carnes v. Sullivan</u>, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence.").

Case No. 5:11cv47/RS/EMT

Here, the evidence does not establish disability without a doubt; thus, a remand for further administrative proceedings is the appropriate remedy.  In reaching this conclusion, the undersigned has considered several factors, including the following four factors.  First, Plaintiff alleges disability as of December 31, 2004, but the record clearly does not establish disability "without a doubt" as of that date.  Second, Plaintiff's testimony does not establish precisely when the problems with his hands began; it establishes only that they began some time after his first surgery.  Third, the record suggests that Plaintiff's problems with his hands worsened over time.  For example, the problems he reported in August 2006 are not as severe or debilitating as those he reported in October and November 2007.  Thus, upon remand the ALJ should determine the onset and progression of Plaintiff's problems with his hands and if, or when, they resulted in an inability to work prior to January 1, 2008.  Fourth, as noted in footnote seven, *supra*, the file appears to be missing records from a time frame highly relevant to the query upon remand (that is, from mid-to-late 2006 through October 2007), and it contains inconsistent information as to Plaintiff's whereabouts during that time frame.  Upon remand the ALJ should therefore endeavor to ascertain Plaintiff's whereabouts during this period and attempt to obtain any pertinent records that may exist.  For example, if Plaintiff indeed received medical treatment in Virginia during this time, the ALJ should attempt to obtain those treatment records; if Plaintiff was then incarcerated in Georgia, the ALJ should attempt to obtain his prison or jail records, as such records often contain information regarding an inmate's physical condition or medical treatment.  The records from Virginia or Georgia may also be relevant to the ALJ's analysis of Plaintiff's credibility.

VI.     CONCLUSION

For the foregoing reasons, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and should not be affirmed.  *See* 42 U.S.C. § 405(g); Foote, 67 F.3d at1556 (remanding for additional administrative proceedings).

Accordingly, it is respectfully **RECOMMENDED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this Report and Recommendation, and that the Clerk be directed to close the file.

Case No. 5:11cv47/RS/EMT

At Pensacola, Florida this 21st day of February 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.** A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* **28 U.S.C. § 636;** United States v. Roberts**, 858 F.2d 698, 701 (11th Cir. 1988).**